Case number 24-1905, Scott DeBruyn v. Adam Douglas. Oral argument, not to exceed 15 minutes per side. Zoe Chang, law student, for the appellant, may proceed. Good morning, Your Honors. And may it please the Court. Good morning. Daniel Scott Durao on behalf of the appellant Scott DeBruyn. It's my pleasure to introduce recent graduates of NYU School of Law Zoe Chang and Matthew Grossman, who will be arguing the case under my supervision. Fantastic. Thank you. So Ms. Chang, just so I understand, you're doing the entire argument and then Mr. Grossman's doing the entire rebuttal. That's correct. OK, great. You may proceed when you're ready. Good morning, Your Honors. Zoe Chang on behalf of appellant Scott Alan DeBruyn. May it please the Court. I'd like to reserve five minutes for rebuttal. You may. The Supreme Court has stated time and again that certain criminal cases will arise where the only reasonable strategy requires consultation with experts or the introduction of expert testimony. This was one such case. Despite knowing that the state's case turned on expert testimony from a toxicologist, and despite knowing that the only available defense was to challenge that expert testimony, Mr. DeBruyn's trial counsel failed to consult with an independent toxicologist. They stopped woefully short of completing an adequate investigation in a case where their client was facing life in prison. And as a result of their ignorance, made the objectively unreasonable decision not to call a defense expert. Given what we now know about the defenses they would have uncovered, there is a reasonable and indeed a substantial probability that if it weren't for trial counsel's sufficient performance, the outcome in Mr. DeBruyn's case. Which defense do you think was the strongest from your perspective, or the one that was most clearly overstated in that trial? You have a lot of different theories. Which one's the strongest? So one of the key exculpatory theories that the jury did not hear is that it was scientifically impossible for the oxycodone in the decedent's blood to have come from the Percocet that Mr. DeBruyn was alleged to have bought. And this was a major omission, because in failing to speak to the proper expert, trial counsel were not aware of this defense, and therefore could not have made a strategic decision to forego this defense. I wasn't clear from the record, did Dr. Spitz hold himself out as a toxicologist? So trial counsel found Dr. Spitz by consulting a SATO list with experts, and he was listed as both a toxicologist and a pathologist. But it became clear during their conversation with Dr. Spitz that he was, in fact, not a toxicologist. And what do you do with the language in Harrington that we leave that to defense counsel if they consult someone in the relevant area, so to speak, and that we're not to judge which particular area and specifically they must consult someone from? I think that the language in Richter makes clear that there are certain cases where scientific testimony will not be core to either the prosecution or the defense. And in those cases, it may be proper to rely solely on cross-examination, and we leave those decisions to trial counsel. But what Strickland and Wiggins make clear is that trial counsel has a duty to make a proper investigation before they're able to make those kinds of strategic decisions, and that decisions made after a less-than-complete investigation cannot possibly be considered strategic. And I think this court's case law interpreting Strickland and Wiggins also makes that clear. Which case? So I think one of the cases that makes that clear is, as we say in our briefs, Ritchie and Sturmer. But didn't we abrogate Ritchie in a subsequent case in Kendrick? I think that Kendrick criticizes Ritchie for not applying ed pediferans in the way that it should have. But what? Well, I thought it said it didn't basically apply ed ped at all. Kendrick may have said that, but I want to make clear that the underlying IAC analysis that Ritchie conducted and its interpretations of Strickland and Wiggins is still binding on this court because it has not been reversed en banc. And it's still important in considering whether or not the Michigan Court of Appeals was unreasonable in applying. Didn't Ritchie predate Harrington? I mean, that's what we say in Kendrick. And Kendrick's published. Yes, so Ritchie did predate Richter. However, Ritchie was after Strickland and Wiggins and properly applied those precedents. And this court case's couch debooker cited both Ritchie and Richter. And so they still cited Ritchie, even though it came after Richter. And as this court in Kendrick had criticized for it, noted that it did not properly apply ed pediferans. Sounds like we should publish a case that should clarify it. Yes, Your Honor. I believe that Ritchie is still binding on this court unless it is reversed en banc. And I also want to point out that Kendrick actually distinguished the facts of Richter as well. So in Kendrick, Kendrick was much closer to Richter than Ritchie was. Specifically in Kendrick, science was not central to either the chosen prosecution or the defense. And that was a key way in which it distinguished itself from Ritchie. Let me go back. Let's say we're not over. Let's say Ritchie is still good law. What do you do with Kendrick's language that they were applying de novo review in Ritchie and not ed pediferans? Does that create, I mean, why should we follow Ritchie if it has nothing to do with applying ed pediferans? The reason why Ritchie is still important is because Ritchie was still applying Strickland and Wiggins to a case in which there was a problem with what trial counsel did in the investigation. I think that's a fair point. But I think the problem is, right, through the lens of de novo, it's much different than ed ped. I think we would argue that because ed pediferans here is not due, that that's the reason why prejudice in particular and deficient performance should also be de novo. And that is why when you're analyzing whether or not the Michigan Court of Appeals was reasonable in applying precedence, Ritchie is still important to look at because it's an interpretation of what the Supreme Court is saying in a factually similar situation. So I want to make sure that I talk about the three ways in which Mr. DeBrine was prejudiced as a result of trial counsel's deficient performance. So I already mentioned that the jury did not hear a key exculpatory theory, which is that because of the lack of acetaminophen in the decedent's blood, it was scientifically impossible for the oxycodone to have come from the purpose act. So there was a lot of adhering. There was testimony that this metabolizes more quickly. It was a pretty straightforward theory that was sort of confirmed during the Ginter hearing. So during the Ginter hearing, the state's expert pointed out that it was possible that acetaminophen was metabolized faster. But what's really important is that the state's expert qualified that opinion. Specifically, he said that it is difficult to predict for any given person what a half-life would be for acetaminophen. And so the state's expert actually admits on this theory based on the idea that we'll see never-used Percocet. Did you use Percocet during this time period? Yes. The argument is that it would have been scientifically impossible for the oxycodone in her system at the time of death to have come from the Percocet, Mr. DeBruin is alleged to have bought. There's so much evidence that she was a user before. They used together. She was really craving the drug. He purchased the drug. There's a lot of evidence pointing to the fact that he likely provided her Percocet. And this theory really cuts against a lot of evidence. I couldn't let the defense counsel think this is a really hard left to tell the jury that they weren't using Percocet. There's all these messages, past history, that this is what they did in order to get it. Well, I have two responses to that first, to that, Your Honor. First, trial counsel were not aware of the acetaminophen defense. So to say that they considered it, but then looked at the evidence and thought that it wasn't strategic to bring up is not accurate, because they weren't aware of this theory. Do we say objectively, objectively, if the lawyers would have been aware, it would have been certainly a permissible defense strategy to say we're not going to go down that road, because the evidence is really against it. It's going to hurt us, the jury, to make sort of a hail Mary, but to make an argument that there's a lot of evidence that you have to counter to. So that is certainly something that can be considered when you are considering prejudice. But what the Michigan Court of Appeals did wrong is it actually collapsed the deficient. That seems to me, and maybe now I'm collapsing, but why couldn't that go to deficiency? In other words, a counsel's strategic choice not to pursue a route of evidence that would make them look bad in front of the jury. Why isn't that, at least the strategic choice, something we look at with deficiency? The reason why, in this case, it could not have been strategic is because trial counsel did not know about the defense and therefore could not have weighed. He did, and I'm sorry to interrupt you, he did consult two experts, one is in one of the states, and both said oxycodone was a cause of the death, right? Both his spits and the other of the states, whoever it was. I'll take those experts one by one. So when it comes to Dr. Spitz, Dr. Spitz was not a toxicologist. And so Dr. Spitz would not have been able to catch the acetaminophen defense because as the state's own experts admitted during the Ginther hearing, they were not qualified to render an opinion as to acetaminophen. And that's on pages 2024 and 2035 of the Ginther hearing. So consulting with Dr. Spitz, who was not qualified in the area of science that they were looking for, meant that they were not able to get a full investigation and conduct the investigation that they had a duty to conduct through only Dr. Spitz. Now, when it comes to Dr. Kouslikas, I think what's important is that Dr. Kouslikas was the state's paid expert, had already rendered an opinion on behalf of the state at the preliminary hearing, and Mr. DeBrine's trial counsel actually admitted during the Ginther hearing that they knew that consulting with the state's expert would not be effective because they had already rendered an opinion on behalf of the state. And that's Ms. Tover on page 2048 of the Ginther hearing. I'm asking, I think you had another theory, so separating those theories, what's the next best theory as to why counsel was deficient? I think the next best theory, Your Honor, is the difference between what serotonin looks like at the trial versus what it looked like at the Ginther hearing. So at the trial, it is true that trial counsel advanced the theory that serotonin syndrome was the alternative cause of death with no involvement from oxycodone. But importantly, the state's expert completely undermined that theory at trial because Dr. Carr testified that oxycodone would have contributed to serotonin syndrome. At the Ginther hearing, the defense experts directly rebutted Dr. Carr's testimony from trial. Dr. Commisera specifically stated that oxycodone would not have contributed to serotonin syndrome, and that serotonin syndrome and the symptoms that the decedent was experiencing was inconsistent with any oxycodone-induced cause of death. And so here, you have a situation in which trial counsel, because they failed to properly understand the science, and because they failed to call a defense expert, presented a hollow shell of what they could have presented. So at trial, one of the main offenses was the serotonin. This is the overheating, the body overheats. Yes, Your Honor. This is one of the main defense theories. This is why the decedent died. Yes. You're saying that defense counsel should have argued that, so I'm sorry, so you're saying Percocet was, at trial, Percocet, the defense counsel, did not argue that, I'm sorry, how does the Percocet use relate specifically to this theory that defense counsel, at trial, should have argued that Percocet would not have contributed to this? This is a separate theory. So the Percocet theory is a theory that even if oxycodone played a substantial factor, the oxycodone in the blood could not have come from the drug that Mr. DeBriene was. No, this is just the overheating theory. You said that it could or could not be consistent with Percocet. It could not be consistent with oxycodone. So this is where they're advancing an alternative non-oxycodone cause of death. So the theory then is that the serotonin syndrome is caused by the Prozac that she's taking and that Tramadol or what else is there that's the theory that's causing her to do this overheating and obviously there's substantial evidence that she lowered the temperature and was hot even with her clothes on, things like that. Yes, so Prozac and Tramadol both are SSRIs, which means that they increase the amount of serotonin in the brain, which can lead to a fatal seizure and those symptoms are consistent with what the decedent was experiencing. And he did cross-examine on that. Is your point that they should have called an expert on this to counteract the state's expert's testimony that oxycodone could contribute to that? Yes, Your Honor, because what happened in cross-examination is the state's expert completely undermines this theory by stating really with no evidence that oxycodone would itself have contributed to serotonin syndrome. And with no expert, there's no way to combat that theory and the jury, all they hear is the presentation of a theory on cross-examination that is very quickly shut down. Is this point already closed? Was the specific part of oxycodone contributing to that argument in closing? I'm not aware of whether the prosecution specifically argued that in closing. Thank you very much. Thank you, Your Honor. Good morning, Your Honors, and may it please the court, Assistant Attorney General Jared Schultz on behalf of the respondent. Camille Jeziakowski did not have to die. Yes, she was an addict, but she had family who were actively trying to help her. Scott DeBruin did not let them. There are several components to this appeal, but the basic facts are undisputed. It is uncontroverted that Ms. Jeziakowski asked Mr. DeBruin for oxycodone pills, that Mr. DeBruin was all too willing to get those pills for her, that Mr. DeBruin did obtain those pills, and that Ms. Jeziakowski died with a substantial amount of oxycodone in her system, along with other substances, after spending the night with Mr. DeBruin and most of the prior few days with him. Mr. Schultz, I wonder if you might address the kind of last thing we were talking about with your friend on the other side about the kind of potential inadequacy and failure to rebut the testimony about serotonin syndrome and the idea that oxycodone would still be a substantial cause of serotonin syndrome if that's the basis for death. Yes, so at trial, counsel did cross-examine each of the prosecution's witnesses extensively about these alternative theories, alternative causes for death. Serotonin syndrome was a significant part of cross-examination. Each, or excuse me, not each, but several of the witnesses testified that yes, serotonin syndrome could have played a role. I think one witness even said, yes, that was a part of the death, but they qualified their opinion and said, that doesn't matter because oxycodone was still a substantial player in her death. Whether counsel would have gotten an expert to counter that, I don't think would have made a difference at all in trial, because again, at the evidentiary hearing, each expert, each of the prosecution's experts said, well, that does not alter our conclusion. Can I ask you a different question, which is I thought they were saying that oxycodone was contributing to the serotonin syndrome. That's different than oxycodone is also a factor in her death, or a substantial factor in her death. Sure. I guess I didn't really see the interplay there between whether oxycodone played a role in that. Well, it eliminates serotonin, right, as a, let's say a jury's looking for a substantial factor in the death, and the way, and maybe I'm thinking of it wrong, and you should correct me, but the serotonin is a theory, as Judge Lukacs said to your friend on the other side, that had support in the record. I think we all agree on that.  And then I get up, and you're cross-examining, and they say, well, oxycodone contributed not only, was not only a substantial factor in the death, but contributed to serotonin, so it would also be then, when we're, if I'm a jury, I'm just thinking, well, that eliminates the serotonin, because the oxycodone contributed to that as well. Sure. Again, I don't think that really matters. I think that's a distinction without a difference, because even after the prosecution witnesses were confronted with that theory at the evidentiary hearing, they still said oxycodone, whether it's a contributory factor of serotonin syndrome independently, or to the death as a whole, was a substantial factor in the death. I don't see why one witness, one toxicologist, who could say, oh yeah, you know, serotonin syndrome probably played a more substantial role, but we still have mixed toxicity as the cause of death, which Dr. Komisaris did say was that mixed toxicity drugs was the cause of death. I don't see why a jury would all of a sudden change their opinion based on this one expert witness's testimony. Do you know if the government's argument wasn't closing? Was the government's argument that even if there was the serotonin issue, that oxycodone still contributed to that, or was it what the way the case seems to be presented, which is he supplied with oxycodone, and that was the reason for death, separate from whether serotonin was, I didn't see it as that being tied, that serotonin being tied to oxycodone, how the case is argued. We can go back and look at it, but I didn't see how the case was argued in closing. And I apologize, I had just read the defense counsel's closing, but it's been a while since I read the prosecution's closing. I don't recall if they said even if serotonin syndrome was a cause, whether that was still, oxycodone was still a substantial factor. I do know that a lot of the argument was about whether Mr. DeBruin did provide her with the Percocet, the oxycodone, and there was substantial evidence in the record saying that he did. There was text messages saying, look, I've got, I'll give you oxycodone, I got it from Mr. Montgomery, Lola Daniels. This was right before she got out, right before she was found with Mr. DeBruin dead in the hotel room. And I kind of want to point out one important part about this case is that EDPA does apply here. Whether we're talking about deficient performance or prejudice, it doesn't matter whether this court thinks that those prongs were met. It matters whether all rational jurors could disagree with the Michigan Court of Appeals' decision. The petitioner can't show that here. He tries to kind of undermine whether EDPA applies by pointing to four different things. I don't think any of them work. The Michigan Court of Appeals didn't collapse the two prongs here. As Your Honors kind of discussed in the argument with my friend on the other side, whether it's a viable defense is a component of the deficient performance prong. That's what the Michigan Court of Appeals was doing here, was determining this wouldn't have been a viable defense, it was therefore objectively reasonable to forego presenting these theories at trial. This was not the wrong standard either. If you look at the Michigan Court of Appeals' opinion, they cited Strickland, they cited the correct federal standard. That they used a few words that were incorrect does not mean that the standard was wrong. In fact, that's exactly what EDPA is designed to prevent, is de novo review just based on a few straight words here or there. It has to be an unreasonable application of Strickland, not a wrong or a few words that were erroneous. Can I ask you about what they called their kind of principle theory, the acetaminophene in the urine? If they had an expert that said, the counteracted the state's expert and said that the acetaminophene in the urine shows it has taken days before, wouldn't that create a problem for your case? That particular testimony could, yes, that's a point for the other side, but every single expert. Why shouldn't they have consulted their own toxicologist and potentially called them? I think in this case, because they did consult an independent pathologist. I understand it's not a toxicologist, but the state called two pathologists to testify to these very facts, these toxicology results. I don't think it's unreasonable to interview an independent pathologist and the state's toxicologist who all said the same thing that the death, oxycodone was a substantial cause of the death to then, and considering that along with all the evidence in this case that shows that no doubt, Ms. Jezikowski got pills from Mr. DeGruen. I think it's reasonable to take all that into consideration and then say, we don't need to go through an endless fruitless search of all the experts. I can't remember, he bought 40 Percocet, is that right? Yes, that's what the evidence is. And then did they find any Percocet in the room? No, they did not. But we have to remember that we still have all this evidence that she was trying to get oxycodone pills. He got oxycodone pills, and then she was spending a substantial amount of her time after being released from jail with Mr. DeGruen. Not that there's anything in the record that says that he tried to hide anything, but he was out in the parking lot when the police came. There's evidence that shows that he had a conscience of guilt. He didn't call 911 himself despite having a cell phone. I think that shows that he knows he's done something wrong in this case. And again, the acetaminophen theory, I don't think was going anywhere, whether that would have been presented or not at trial. All of the state's experts at the evidentiary hearing said that the acetaminophen in her urine, not in her blood, was fully consistent with her having ingested Percocet shortly before her death. Whether one expert would have testified to a different conclusion at trial would not have made a difference here. How do you respond to Ritchie? So as you pointed out, Your Honor, Ritchie was wrongly considered under AEDPA. Here we have to give evidence. It is published, though. Yes, Your Honor, and... I think I'll still stick with the fact that I believe it was wrongly considered under AEDPA. Even if you look at the facts of the case, they're different there. The facts in Ritchie, the counsel did not even consult with, he hired an expert, didn't even consult with the expert, though, and raised a completely different theory. Here, counsel consulted with experts, one that counsel thought was, you know, he had dealt with before, thought was an important expert in this area, and then decided, based on that information, to go with cross-examination instead of hiring, or instead of searching out different experts. Again, you know, we have evidence that there was supposedly a list of 100 different toxicologists in the state of Michigan. At trial, or excuse me, at the evidentiary hearing, they could only produce one, one toxicologist. What's to say that, or how long does the counsel have to search through the directory of experts before they find one expert willing to testify in their favor? But is it unreasonable to expect that they would have tried to talk to one toxicologist? Like, maybe they talked to one, and it wasn't going anywhere, and you say, okay, well, you don't have to try and find many others, but here we have a pathologist, and maybe you say, well, these are close enough, and I'm wary of saying, well, when do we say the expert fields are close enough, or far enough away, or things like that. But I don't think the other side is saying, you know, you have to interview 20. I think they're saying they didn't even interview one. Yes, that's fair, but we have to remember that they also talked to the state's toxicologists. I understand that the state, that it's a state's witness, but that's kind of where the case Lewis comes in, that I cited in the brief. There, the counsels talked to the medical examiner, forensics examiner, and that's it. The state's paid forensics examiner trusted that expert witness's testimony and decided to forego a defense based on expert witnesses in that case. I think that's very similar here. It doesn't matter that this toxicologist was a state's witness. What matters is counsel's evaluation of that testimony, and whether he trusted that, or excuse me, that what that expert was saying, and therefore used his independent judgment to decide to cross-examine instead of go and talk to another toxicologist who, in his opinion, would likely give the same opinion. Again, I think this case all goes back to AEDPA, whether all rational jurists would disagree with the state court's opinion. The other thing that the petitioner says is there was an unreasonable determination of facts. If you look at the record here, that's not true. The Court of Appeals accurately outlined the facts and what each expert witness testified to, and AEDPA certainly is constitutional. There's no case out there that says it's not. I do want to point this, this goes to their argument that Loper-Bright undermines AEDPA's constitutionality. I just want to briefly point this court to Case Miles v. Floyd. It's an unpublished opinion, but it did say that, did consider these very arguments and said that AEDPA is constitutional. So I, if you have any questions. Thank you, Counsel. Thank you, Your Honors. Mr. Grossman, you have five minutes. Good morning, Your Honors. May it please the Court. Matthew Grossman representing Appellant Scott DeBriene. I'd like to start by discussing the quality of defense counsel's investigations a little bit more. I think opposing counsel focused a lot on counsel's decision to talk to Dr. Spitz and Dr. Kouslikas. I'd like to emphasize how little work it would have required counsel to have found a toxicologist. At the Ginther hearing, Ms. Tober actually testified that she had a whole list of toxicologists she had assembled. And so going one down the list would have been very easy for them to do. This wouldn't have required hours of extra work or a deep research if they had other toxicologists to consult. And I think along those lines, counsel knew they needed a toxicologist. Both Mr. Leinholz and Ms. Tober testified at the Ginther hearing and stated we knew we needed a toxicologist. And so the idea that a forensic pathologist is close isn't really relevant because they had identified the group. I'm still confused about Spitz. Didn't he at the Ginther hearing hold himself out to be a toxicologist? So Spitz wasn't at the Ginther hearing. And the- Or the attorney said he held himself out and the resume said he was a toxicologist. That's correct, your honor. And the list confirmed that he was a toxicologist. But once they spoke to him, they said it was readily apparent he was not a toxicologist, both Ms. Tober and Mr. Leinholz. And then the other experts at the Ginther hearing, the state's experts, said they knew Dr. Spitz and that he was not a toxicologist. And so I think it would have been very clear immediately that he was not. And then I think to just also address the idea that Lewis is dispositive here about counsel consulting. Is there, just out of curiosity, are there any cases that say the defense counsel can't rely on what an expert's resume says or what an expert tells them? Or like something that says they have to investigate behind the expert, what the expert tells them? I don't know of any cases requiring investigating behind the expert, but I would point out here that they didn't need to do any more investigation because after the call, they knew he was not a toxicologist. It wasn't like they only discovered it later on. But just to quickly address Lewis, I think, Lewis isn't really standing for the proposition that if this defense counsel consults the state's expert, that's okay. In part because Lewis is not a state's hired gun. It's just a public employee. And the opinion in Lewis doesn't even make clear that the deputy coroner in that case even testified for the state. So equating a public employee to a state's witness doesn't really make sense. And Lewis is distinguishable for other reasons, including the idea that in Lewis, defense counsel had an affirmative reason not to pursue a scientific theory because it would have required heavy trade-offs involving sort of gruesome autopsy photos. And that's not applicable here because counsel chose to follow a science-based defense anyway. I'd also just like to talk about Mr. Schultz's arguments about AEDPA a little bit. But while it is sometimes permissible for courts to consider the viability of defenses when thinking about division performance, that's only when counsel knew the information to make that decision. According to Strickland, the whole point of the division performance test is to put us in the shoes of counsel. And so if counsel didn't know if these theories would be viable, if they didn't know what an expert would say, we can't say this was a strategic decision based on what would have happened. And this court has held as much recently in Upshot where it found the Michigan Court of Appeals again doing an unreasonable application of Strickland when it did this collapsing. What do you do with the fact, as Judge Rather pointed out, that there was pretty strong evidence of Percocet? And so having an expert say, no, that wasn't the cause of death, would just diminish from it. And the better strategy was to cross-examination on the other, what you call your second defense, the Sarah Toman or whatever, the Keith defense. I think, Your Honor, that if counsel had known about the acetamin defense and investigated it and knew what it would look like and then made a strategic choice not to use it, that would have been fine. But that's not what happened here because they didn't know about acetamin offense. And I'd also just like to emphasize from a prejudice perspective that there were plenty of reasons counsel, or sorry, the jury could have bought this defense. While it is true that the decedent spent a lot of time with Mr. DeBryan, she was out of jail for about five days and she only spent half of that time with him. She spent significant time on her own. We have text messages between her and Mr. DeBryan indicating she was seeking drugs from other people. And I think particularly importantly, she had Tramadol in her system when she died. There is no connection between Mr. DeBryan and Tramadol and the decedent didn't have a prescription. And so I think there's plenty of circumstantial evidence that she got drugs from elsewhere. I have evidence presented to the jury. Some of that evidence was presented to the jury, but counsel didn't really focus on that in their argument. And I think having this evidence about the acetaminophen and evidence that a different form of Oxy killed her is much more, it's sort of confirmatory to that evidence. It seems like a lot of cases where the counsel presented the arguments, could have done a better job maybe. That's not a case in most part where they didn't pursue, at least pursue these lines of argument with the jury. I think that they did pursue those lines of argument with respect to serotonin syndrome, DFE intolerance, but I think as Ms. Chang mentioned, the serotonin syndrome, that argument actually became inculpatory based on Dr. Carr's testimony and it wasn't exculpatory. And I think similar things happen with respect to DFE, for example, where the state's experts did admit that DFE could be a contributing factor, but they said it would still be one component of something caused by Oxy. Whereas at the Ginthard hearing, the defense's experts ruled that out. And both Dr. Gislukas and I believe it was Dr. Carr stated that DFE alone could have been fatal. And I would also just point out again that in addition to the acetaminophen defense, counsel simply didn't mention Keppra at the trial. And so Keppra is an anti-seizure drug. And so because the decedent was prescribed Keppra and it was clear from the toxicology report that she was not taking that Keppra, that would have made- It wasn't unclear why she was prescribed it and it wasn't clear for when she would have stopped taking it. It seems like there are a lot of questions about that whole line of argument. So there was- This is not something that's been argued yet in this case. So usually in rebuttal, you don't get- I'm sorry. But that's just a thought. So just with respect to that, about Keppra. I'm sorry, I lost my train of thought. That's a cheap shot. Thank you. I'd just like to close by asking this court to grant Mr. O'Brien's writ. Thank you. Thank you very much. We'd love to thank NYU. We really appreciate you coming. Ms. Chang and Mr. Grossman, you've done really well. And Mr. O'Brien has great representation. Your brief was excellent. So we appreciate and we hope you'll come back and thank you to the state of Michigan. The case will be submitted.